THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

\* \* \* \* \*

UNITED STATES OF AMERICA      \*   4:19-CR-160-SDJ-KPJ
                             \*   Plano, Texas
VS.                          \*
                             \*   10:43 a.m. - 11:43 a.m.
DAVID CHRISTOPHER CYS         \*   November 26, 2019

\* \* \* \* \*

**ARRAIGNMENT AND DETENTION HEARING**

BEFORE THE HONORABLE KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE

\* \* \* \* \*

Proceedings recorded by electronic sound recording
Transcript produced by transcription service

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 \* 409-330-1610

 1  **APPEARANCES:**

 2  For the Government:

 3       MR. ERNEST GONZALEZ
         **U.S. Attorney's Office**
 4       **Eastern District of Texas**
         101 East Park Blvd. Suite 500
 5       Plano, TX 75074

 6  For the Defendant:

 7       MR. RICHARD E. WEAVER
         **Attorney at Law**
 8       130 S. Kentucky
         McKinney, TX 75069

 9  U.S. Probation:

10
         FRED FORMAN
11
    Deputy Clerk:
12
         TOYA MCEWEN
13

14                         **WITNESS INDEX**

15  GOVERNMENT'S EVIDENCE:

16       Special Agent Sean Geary

17            Direct Examination by Mr. Gonzalez..... 13

18            Cross-Examination by Mr. Weaver........ 27

19            Redirect Examination by Mr. Gonzalez... 32

20            Recross-Examination by Mr. Weaver...... 36

21  DEFENDANT'S EVIDENCE

22       April Davis

23            Direct Examination by Mr. Weaver....... 45

24            Cross-Examination by Mr. Gonzalez...... 46

25

```
 1              P R O C E E D I N G S

 2          10:43 A.M. - NOVEMBER 26, 2019

 3              THE COURT:  The Court calls Case No.

 4  4:19-CR-160, United States vs. David Christopher --

 5  I'm not entirely sure how to pronounce this last name.

 6  Is it Cys (Sice)?

 7              DEFENDANT CYS:  Cys (Sice), yes.

 8              MR. WEAVER:  Thank you, Your Honor.

 9              MR. GONZALEZ:  Your Honor, Ernest Gonzalez for

10  the Government.  The Government is ready to proceed.

11              THE COURT:  Good morning.

12              MR. GONZALEZ:  Good morning.

13              [Pause]

14              THE COURT:  Mr. Cys, you can go ahead and

15  come up to the podium, please.  I'm going to do your

16  arraignment first.

17              DEFENDANT CYS:  Oh, where, right here?

18              THE COURT:  Yes.

19              MR. WEAVER:  Your Honor, Richard Weaver for

20  Mr. Cys.  I just haven't announced yet.  With regard

21  to the arraignment, is that on the Second Superseding

22  Indictment?

23              THE COURT:  Yes.

24              MR. WEAVER:  And to be honest with you, Your

25  Honor, I haven't been able to go over the Count Four
```

1   that was alleged in that Indictment, but I will.

2             THE COURT:  Okay.

3             MR. WEAVER:  If you'll give me a moment.

4             THE COURT:  All right.  You let me know when

5   you're ready.

6             *[Pause]*

7             MR. WEAVER:  Thank you, Your Honor.

8             THE COURT:  Okay.  Mr. Cys, please raise your

9   right hand to  be sworn.

10            DEPUTY CLERK:  You do solemnly swear that the

11  testimony you are about to give in the cause before the

12  Court will be the truth, the whole truth, and nothing

13  but the truth, so help you God?

14            DEFENDANT CYS:  Yes.

15            DEPUTY CLERK:  Thank you.

16            THE COURT:  We're here today, sir, for your

17  arraignment, as well as your Motion to Reopen the

18  Detention Hearing.  As you know, you've been charged

19  with violations of federal criminal law in the Second

20  Superseding Indictment.  Have you received a copy of

21  that Indictment?

22            DEFENDANT CYS:  My attorney just put it in

23  front of me.  He told me what he knew, what the changes

24  were.

25            THE COURT:  Okay.  Do you want more time to

1   look at it?

2            DEFENDANT CYS:  No, ma'am.

3            THE COURT:  Okay.  You do have the right to

4   have this Indictment read aloud at this time or you may

5   waive that right.  What would you like to do?

6            DEFENDANT CYS:  I'll waive the right, Your

7   Honor.

8            THE COURT:  All right.  I will ask

9   Mr. Gonzalez is you will please advise Mr. Cys of the

10  charges contained in this Indictment, as well as the

11  associated penalties.

12           MR. GONZALEZ:  Yes, Your Honor.  It's a

13  four-count Indictment, Second Superseding Indictment.

14  Count One alleges a violation of Title 21, United

15  States Code, Section 846, Conspiracy to Possess with

16  the Intent to Manufacture and Distribute GHB.

17              Count Two alleges a violation of Title 21,

18  United States Code, Section 846, Conspiracy to Possess

19  with Intent to Manufacture and Distribute

20  Methamphetamine.

21              Count Three alleges a violation of Title

22  21, United States Code, Section 848(a), Continuing

23  Criminal Enterprise.

24              And Count Four alleges a violation of

25  Title 18, United States Code, Sections 1956(h) and

 1  1956(a)(2)(A) and (a)(2)(B)(i), Conspiracy to Commit

 2  Money Laundering.

 3            And it also gives a Notice of Intent to

 4  Seek Criminal Forfeiture.

 5            A possible range of punishment for the

 6  offenses are as follows:

 7            For Count One, imprisonment for a term of

 8  not more than 20 years, a fine not to exceed $1

 9  million, or both, and a term of supervised release of

10  at least three years.  And there is a $100 Special

11  Assessment.

12            For Count Two, if 500 grams or more of a

13  mixture or substance containing a detectable amount of

14  methamphetamine, or 50 grams or more of methamphetamine

15  actual, not less than 10 years and not more than life

16  imprisonment, a fine not to exceed $10 million, or

17  both, and a term of supervised release of at least five

18  years.  And there is a $100 Special Assessment.

19            For Count Three, any person who engages in

20  a continuing criminal enterprise shall be sentenced to

21  a term of imprisonment, which may not be less than 20

22  years and which may be up to life imprisonment, a fine

23  not to exceed $2 million, or both, and a term of

24  supervised release of at least eight years.  If any

25  person engages in such activity after one or more prior

1  convictions under this section have become final, he or

2  she shall be sentenced to a term of imprisonment, which

3  may not be less than 30 years and which may be up to

4  life imprisonment, a fine not to exceed $4 million, or

5  both, and a term of supervised release of at least 10

6  years.  And there is a $100 Special Assessment.

7              For Count Four, punishment is not more

8  than 20 years imprisonment, a fine not to exceed

9  $250,000, or twice the pecuniary gain or loss, and a

10  term of supervised release of not more than three

11  years.  And there is a $100 Special Assessment.

12          THE COURT:  Thank you.

13              Sir, do you understand the nature of the

14  charges alleged against you?

15          DEFENDANT CYS:  Yes, ma'am.

16          THE COURT:  All right, please state your full

17  name and age for the record.

18          DEFENDANT CYS:  David Christopher Cys, age 52.

19          THE COURT:  What is the last grade of school

20  you've completed?

21          DEFENDANT CYS:  A Associate's Degree in

22  college.

23          THE COURT:  Have you ever been diagnosed with

24  any mental illness or problem?

25          DEFENDANT CYS:  No.

1          THE COURT:  Are you currently under the

2   influence of any drug or alcohol?

3          DEFENDANT CYS:  No.

4          THE COURT:  Mr. Weaver, do you believe your

5   client is competent to proceed here today?

6          MR. WEAVER:  Yes.

7          THE COURT:  Mr. Cys, then I'll ask you, with

8   respect to Counts One through Four in the Second

9   Superseding Indictment, how do you plead, guilty or not

10  guilty?

11         DEFENDANT CYS:  Not guilty.

12         THE COURT:  I'll accept your plea of not

13  guilty to Counts One through Four.  You do have a

14  Pretrial Conference set before Judge Jordan on January

15  6, 2010.

16             All right, with respect to defendant's

17  Motion to Reopen the Detention Hearing, I believe that

18  motion is opposed.

19         MR. GONZALEZ:  That is correct, Your Honor.

20         THE COURT:  The Initial Detention hearing was

21  waived by defendant.

22             Mr. Gonzalez, what's the basis of the

23  objection or opposition?

24         MR. GONZALEZ:  Well, Your Honor, the defendant

25  is looking at a substantial amount of time.  The

1  presumption does apply.  We believe that based on the

2  information provided in the Pretrial Services Report,

3  he continues to be a continuing threat to the community

4  and a risk of flight.

5          THE COURT:  All right, Mr. Weaver, what is the

6  basis for asking the Court to reopen the issue of

7  detention?

8          MR. WEAVER:  If I may have just a moment, Your

9  Honor.

10          *[Pause]*

11              When we appeared initially for our

12  Detention Hearing, we were told by the Court that if

13  certain things came about or things changed, we could

14  ask the Court for a new Detention Hearing.  We believe

15  those things have changed.

16          THE COURT:  Can you just give me a summary of

17  what has changed.

18          MR. WEAVER:  Well, we have -- we have a

19  third-party custodian now available, which wasn't

20  available at that Detention Hearing.  We believe that

21  Mr. Cys' circumstances have changed with regard to

22  being able to get released and believe that there are

23  circumstances that should be made known to the Court as

24  to why he believes and why the presumption shouldn't

25  apply in his particular case.  Or we believe we can

1    overcome the presumption.

2            THE COURT:  Okay.  Yeah, I was going to say I

3    don't -- I mean --

4            MR. WEAVER:  It's going to apply.

5            THE COURT:  Presumption applies.

6            MR. WEAVER:  Yes.

7            THE COURT:  It's whether you can present

8    evidence to overcome it.

9            MR. WEAVER:  Yes.

10           THE COURT:  Do you have your third party

11   custodian here today?

12           MR. WEAVER:  I do.

13           THE COURT:  Okay.  All right, I'll grant the

14   motion.  I think y'all are prepared to go forward with

15   the Detention Hearing; correct?

16           MR. GONZALEZ:  Yes, Your Honor.

17           THE COURT:  All right.  And for the record,

18   have each of you received a copy of the Pretrial

19   Services Report?

20           MR. GONZALEZ:  Yes from the Government.

21           MR. WEAVER:  Yes.

22           THE COURT:  Any objections or modifications

23   that you want to request to it?

24           MR. GONZALEZ:  No, Your Honor.

25           MR. WEAVER:  If I could have just a moment,

1  Your Honor.

2          *[Pause]*

3              Your Honor, with regard to the Pretrial

4  Services Report, one of the, I guess, risk dangers

5  that was assessed in this is violent behavior in his

6  history.  If you're looking through the Pretrial

7  Services Report, there were two incidents, it would

8  appear, of aggravated assault with a deadly weapon.

9  One of those, the first one that was alleged back in

10  2001 was dismissed.  I've been informed that with

11  regard to the one that is pending from April of 2019,

12  Mr. Cys has a retained lawyer on those cases, and that

13  retained lawyer is standing by if the Court needs to

14  talk to him.  Those cases are supposed to be dismissed

15  once Mr. Cys is able to make an appearance in those

16  cases.

17              Mr. Cys currently has, I would suppose,

18  holds for those two cases on him as a result of his

19  incarceration in this case.  But if he's released on

20  this case, those bonds are going to be reinstated, he

21  will be appearing in Dallas court on those cases and

22  it's my understanding, according to his retained

23  lawyer, that they will be dismissed.

24              THE COURT:  Well, but if he has -- if he has

25  pending bonds, the marshals can't release him.  Even

1  if the Court were to find that he could be released,

2  if there's bonds from other courts, that he won't be

3  released.

4          MR. WEAVER:  Well, those bonds are going to

5  get reinstated.  Upon receipt of information that he's

6  released here, the bonding company will reinstate those

7  bonds so that he can released here.

8          THE COURT:  Oh, okay.

9          MR. WEAVER:  Once they get notification from

10 the Court that -- *(Defendant speaks with attorney).*  As

11 he just told me, the lawyer -- and it's normal.  The

12 lawyer didn't want to get the bonds reinstated until it

13 was certain that he was going to get released here.

14         THE COURT:  So you're saying that if he were --

15 if the Court were to say he could be released, that the

16 holds would be lifted in the state court?

17         MR. WEAVER:  Yes, because the bonds would be

18 reinstated.

19         THE COURT:  Okay.  Okay.  Anything else with

20 regards to the report?

21         MR. WEAVER:  Generally, no, Your Honor.

22         THE COURT:  Okay.  I will note for the record

23 that I believe the information -- the Pretrial Services

24 Officer was not able to verify the information

25 contained in the report.

 1             All right, Mr. Weaver, if you want to have

 2   a seat at counsel table with your client.

 3             Mr. Gonzalez, you may call your witness.

 4        MR. GONZALEZ:  Yes, Your Honor.  The Government

 5   would call Special Agent Sean Geary.

 6        DEPUTY CLERK:  If you will raise your right

 7   hand, please.  You do solemnly swear that the testimony

 8   you're about to give in the cause before the Court will

 9   be the truth, the whole truth, and nothing but the

10   truth, so help you God?

11        THE WITNESS:  Yes, ma'am, I do.

12        DEPUTY CLERK:  Be seated, please.

13        THE WITNESS:  Thank you.

14        MR. GONZALEZ:  May I proceed, Your Honor?

15        THE COURT:  Yes.

16    **SPECIAL AGENT SEAN GEARY, CALLED BY THE GOVERNMENT**

17                   **DIRECT EXAMINATION**

18   **BY MR. GONZALEZ:**

19   Q.  Sir, would you please state your full name for the

20   Court and the record.

21   A.  Sean Geary.

22   Q.  Spell your last name for us.

23   A.  G-e-a-r-y.

24   Q.  How are you employed?

25   A.  I'm employed as a Special Agent with the Drug

1   Enforcement Administration.

2   Q.   And prior to coming on with the DEA, did you have

3   any law enforcement experience?

4   A.   I did as a police officer in Massachusetts for

5   seven years.

6   Q.   Okay.  And have you received any specialized

7   training with DEA?

8   A.   Yes, I have.

9   Q.   And have you attended any academies?

10  A.   Yes, I did.

11  Q.   Can you explain that to us?

12  A.   I went to an 800-plus hour training academy with

13  the Drug Enforcement Administration, learning tactics

14  techniques used by drug traffickers, investigatory ways

15  to investigate these drug trafficking organizations.

16  Q.   And you had attended a prior academy when you

17  joined the police department?

18  A.   Yes, I had.

19  Q.   Okay.  And based on your position with DEA, are you

20  familiar with an individual by the name of David

21  Christopher Cys?

22  A.   Yes, I am.

23  Q.   Do you see that individual in the courtroom today?

24  A.   Yes, I do.

25  Q.   Would you point to where he's seated and indicate

1   an article of clothing that he's wearing?

2   A.   Yes, he's wearing a white shirt.

3           MR. GONZALEZ:   Your Honor, may the record --

4   A.   White --

5   BY MR. GONZALEZ:

6   Q.   Go ahead.

7   A.   White jumpsuit.

8           MR. GONZALEZ:   May the record reflect that the

9   witness has identified the defendant?

10          THE COURT:   Yes, it will so reflect.

11  BY MR. GONZALEZ:

12  Q.   Now, sir, are you familiar with the investigation

13  that led to the arrest of the defendant?

14  A.   Yes, I am.

15  Q.   Can you summarize that investigation for the Court,

16  please?

17  A.   Yes.  In about April of 2019, two co-defendants

18  were arrested in The Colony, Texas.  They were found

19  in possession of methamphetamine and GHB.  During a

20  post-arrest statement, one of those co-defendants

21  identified David Cys as a high-level GHB distributor in

22  Dallas, Texas; stated that he had numerous people that

23  worked for him cooking GHB.  That co-defendant

24  explained that Mr. Cys would purchase large amounts of

25  GBL, which is a pre-cursor chemical for GHB, and he had

1  what he explained were cooks working for him that would

2  convert the GBL into GHB.

3          Following that arrest, several other

4  co-defendants were identified in the organization and

5  controlled purchases were made.  Two such in April of

6  2019 was a purchase of methamphetamine from a

7  co-defendant, Rafael Ramirez, and a subsequent purchase

8  of GHB from Rafael Ramirez.

9          In May of 2019, agents learned that Mr. Cys

10 was attempting to sell about 45 gallons of GBL and I

11 began talking as an undercover with Mr. Cys in an

12 attempt to purchase that from him.  Prior to doing

13 that, Mr. Cys provided a DEA confidential source with a

14 free sample of GHB and GBL.  And following that free

15 sample, I purchased the approximate 45 gallons of GBL

16 from Mr. Cys in Lewisville, Texas for $15,000.

17         Following that purchase, I maintained

18 conversation with Mr. Cys and negotiated the purchase

19 of a pound of methamphetamine from him.  That purchase

20 went through a confidential source.  During that

21 purchase, the confidential source went to Mr. Cys'

22 house in Dallas, Texas.  The methamphetamine arrived

23 and Mr. Cys provide it to the confidential source.

24 While the confidential source was there, we observed

25 Mr. Cys smoking methamphetamine.

1          Following that purchase, I arranged to

2   purchase another pound of methamphetamine from Mr. Cys.

3   That purchase went through and he was eventually

4   arrested after I ordered a kilo from him, a kilo of

5   methamphetamine.  During a search warrant of his house,

6   GHB and GBL were located.  Methamphetamine and firearms

7   were located.

8   Q.   All right, so you were dealing directly with the

9   defendant; correct?

10  A.   Yes.

11  Q.   In an undercover capacity?

12  A.   Yes, I was.

13  Q.   And you were negotiating with him the purchase of

14  not only the quantity, but the purchase price for the

15  drugs that you were purchasing from him?

16  A.   Yes.

17  Q.   And you indicated that you were buying GBL,

18  correct, and that's a precursor to GHB?

19  A.   Yes.

20  Q.   And does the GBL convert directly to the same

21  quantity of GHB?

22  A.   No, the conversion rate is about two-to-one, so one

23  gallon of GBL would make about two gallons of GHB.  And

24  this was explained to me by Mr. Cys.  He explained the

25  process of making GHB during that undercover purchase

1  of the GBL from him.  And as part of this

2  investigation, we went into where he obtained the GBL

3  from, which would have been several chemical companies

4  throughout the country.  Mr. Cys maintained what we

5  consider to be a front company, an information

6  technology company called The Geek Group, LLC, which he

7  used to purchase the GBL, saying that was for cleaning

8  computer parts.

9  Q.  So GBL can be used for that purpose, to clean

10 computer parts, but it can also be used to manufacture

11 GHB?

12 A.  Yes.

13 Q.  And basically, Mr. Cys had a company that he would

14 use as a front to be able to purchase that GBL, which

15 he then converted to GHB, and distribute it?

16 A.  Yes, that's correct.

17 Q.  And you testified that he had individuals that were

18 working for him; is that correct?

19 A.  Yes.

20 Q.  And he had individuals that you indicated were

21 either cooking or distributing the GHB for him;

22 correct?

23 A.  Cooking, distributing, and several people that were

24 described as people that took orders from him, they

25 would run errands for him and do whatever he requested

1  of them.

2  Q.   So, based on your training and experience in

3  handling these types of cases, he would have a

4  supervisory role over some of these other individuals;

5  correct?

6  A.   Yes.

7  Q.   And in regards to the quantities that he said

8  during your conversation with him that he could provide

9  you, what quantities did he say he could provide you?

10  A.   Large amounts we purchased, what came out to be

11  about 216 kilograms of GBL from him.  Mr. Cys explained

12  that he could sell multiple barrels of -- a barrel

13  would have been 45 gallons, which he purchased.  He

14  explained that he could sell multiple barrels to us

15  and he could also come up with and sell us kilogram

16  quantities of methamphetamine.

17  Q.   Okay.  And where was he receiving the GBL; do you

18  know?

19  A.   Receiving the GBL at two different locations, one

20  of which being his residence on Clearwater Drive in

21  Dallas, and we observed two barrels arrive there on

22  one occasion.  The second location would have been a

23  warehouse maintained by Mr. Cys and Mr. Ramirez at

24  [Switzer Avondale], Texas.

25  Q.   And if you had to estimate the number of persons

1  that he had working for him or working under him, what

2  would that number be?

3  A.   It would be approximately 10.

4  Q.   Okay.  Now, you also mentioned that he was involved

5  in the distribution of methamphetamine and that you

6  purchased how much methamphetamine directly from him or

7  negotiated directly with him?

8  A.   We purchased directly from him one pound on two

9  separate occasions, so two pounds.  And I also ordered

10  an additional kilogram from him, which did arrive at

11  the house.  However, that was not purchased.

12  Q.   But that was seized?

13  A.   That was seized, yes.

14  Q.   And you also indicated that the confidential

15  informant had the opportunity to enter the house and

16  witness the defendant using methamphetamine; correct?

17  A.   Yes, that's correct.

18  Q.   And that would have been during the time period of

19  this investigation; correct?

20  A.   Correct.

21  Q.   And that would have been sooner than two years ago;

22  correct?

23  A.   Much sooner.  That would have been in May or June

24  of this -- of 2019.

25  Q.   So, if he indicated to Pretrial Services that his

1  last use of methamphetamine was two years ago, that

2  would be a lie; correct?

3  A.   Yes, that is a lie.  On the same occasion he also

4  boasted to me on the phone that he had smoked

5  methamphetamine and that it was a good product.

6  Q.   So that would be a lie if he indicated to Pretrial

7  that he had not used for two years?

8  A.   Yes.

9  Q.   All right.  Now, in regards to the total quantity --

10 strike that.  You've spoken to other individuals that

11 were involved in this conspiracy; correct?

12 A.   Yes, that's correct.

13 Q.   And they provided you information in regards to

14 their activities, as well as the activities of the

15 defendant; correct?

16 A.   Correct.

17 Q.   And did they talk to you about the total quantities

18 of methamphetamine that were involved -- that involved

19 the defendant?

20 A.   Yes, they did.

21 Q.   And if you had to estimate the total quantity of

22 methamphetamine that had been involved with the

23 defendant during the term of the conspiracy with other

24 co-conspirators that have cooperated, what would that

25 quantity be?

1  A.   That quantity within the past year would have been

2  between 20 to 40 kilograms of methamphetamine.

3  Q.   All right.  And in regards to GBL or GHB, would you

4  have an estimate for that quantity?

5  A.   I don't off the top of my head.  A very, very large

6  amount.

7  Q.   So large amounts?

8  A.   Yes.

9  Q.   Would you say in the thousands of gallons?

10 A.   Yes.

11 Q.   Okay.  All right.  Now, you also indicated that at

12 the time of his arrest you found other drugs and drug

13 paraphernalia at his residence.  Were you there for the

14 search?

15 A.   I was.

16 Q.   Can you tell the Court exactly what you found at

17 the residence?  Did you also search the warehouse?

18 A.   We did not search the warehouse.

19 Q.   Okay.  So what did you find at the residence?

20 A.   At the residence there were the barrels of GBL that

21 had been purchased.  There was still remnants of GBL on

22 them, they weren't full.  There was several ounces of

23 methamphetamine and drug use paraphernalia.  There was

24 pipes and paraphernalia to make me think that drug use

25 was going on inside of the house along with

1   distribution.  There was also firearms located from the

2   house.

3   Q.   Okay.  And that was the same residence that the

4   controlled purchases had been conducted in; that would

5   be the residence in Clearwater?

6   A.   Yes.

7   Q.   Clearwater Avenue?

8   A.   Yes, that's correct.

9   Q.   Okay.  And to your knowledge, who was living there

10  with the defendant at that address?

11  A.   At that address we believe several co-defendants

12  were living with Mr. Cys:  Nicole Martinez, Tony

13  Bounds, Brandon Brumfield, amongst others.  There were

14  several other people seen during the investigation that

15  would be there for several days at a time, but not

16  necessarily living there.

17  Q.   And were they also using methamphetamine and GHB

18  there at that particular location?

19  A.   Yes, they were.

20  Q.   And they were doing this with the -- obviously the

21  defendant's consent?

22  A.   Yes.

23  Q.   Okay.  And during surveillance, were other

24  individuals seen going to that residence and purchasing

25  drugs?

1   A.   Yes, they were.

2   Q.   On few or many occasions?

3   A.   On multiple occasions.

4   Q.   Okay.  Now, are you familiar with the defendant's

5   criminal history?

6   A.   Yes, I am.

7   Q.   And what do you know it to be?

8   A.   I know there's guilty convictions of fraud,

9   identity theft, theft, things of that nature.  I know

10  there's an open case out of Dallas County for

11  aggravated assault with a deadly weapon.

12  Q.   Okay.  And going back to the search of the

13  residence, did you find any indications, any

14  documentations of fraud or fake IDs or anything of that

15  nature?

16  A.   Yes, I did.  During the search of the residence, I

17  located numerous fraud related documents.  There were

18  fake IDs with Mr. Cys' photo, but with different

19  people's information on them.  Looked like there were

20  fake checks that were made out to different companies,

21  lots and lots of documents like that.

22  Q.   Okay.  And you indicated that he was using the

23  business that he owned as a front to be able to receive

24  the GHB.  Was he also using that business to launder

25  the money?

1   A.   As far as we know, he was, yes.

2   Q.   Okay.  All right, getting back to his criminal

3   history, I think there is a theft in 1987, so it shows

4   a pattern of contact with law enforcement dating back

5   to 1987; correct?

6   A.   Yes.

7   Q.   It shows a theft back in 1987.  It shows a forgery.

8   It shows another theft where he received five years

9   confinement in 1991.  It shows an aggravated assault

10  with a deadly weapon that was dismissed, a possession

11  of a controlled substance, credit card and debit card

12  abuse where he received 180 days, fraud use, possession

13  of identifying information where he received five years

14  and he was revoked.

15          Do you recall him being revoked from prior

16  supervisions in your examination of his criminal

17  history?

18  A.   Excuse me?

19  Q.   In your examination of his criminal history, did

20  you notice that he had been revoked?

21  A.   I actually did not notice that.

22  Q.   Okay.  Well, in 2006 he was revoked and given five

23  years confinement.  And then he has another confinement

24  for fraud, use, possession, identifying information,

25  credit card abuse in 2005.  Then he's got another

1  credit card abuse in 2012, possession of a controlled

2  substance in 2012, another fraud use of identifying

3  information in 2013, and so on and so forth.  And he

4  also has a false statement and property credit where he

5  receives two years probation and there's a Motion to

6  Revoke with a warrant issued.  Were you aware that

7  there was a warrant issued for him?

8  A.   I was not aware of that.

9  Q.   Okay.  All right.  Now, Agent, based on your

10  training and experience and based on your investigation

11  of this case, have you formed an opinion as to whether

12  this defendant would be a continuing threat to the

13  community and risk of flight?

14  A.   Yes, I do believe he would be.  Based on his

15  criminal history, based on the fraudulent documents

16  that we found in the residence, I do believe he would

17  be a risk of flight along with being a risk to the

18  community.  I believe he'd go back to distributing the

19  date rape drug, GHB, again.

20  Q.   And so in your contacts with the defendant,

21  obviously, he had sufficient intelligence to start a

22  company; correct?

23  A.   Yes.

24  Q.   So he's an intelligent person, but he chose to get

25  involved in the distribution of methamphetamine and GHB

1  instead of the lawful business that he had started?

2  A.   Yes.

3  Q.   During your surveillance or your involvement in

4  this investigation, did you ever see the defendant

5  actually working in lawful employment?

6  A.   No, never.

7  Q.   Okay.  So, basically, he dedicated himself to the

8  distribution of drugs and those around him doing the

9  same?

10  A.   Yes, that's correct.

11          MR. GONZALEZ:  Your Honor, that's all I have.

12  I'll pass the witness.

13          THE COURT:  All right, cross-examination?

14                    **CROSS-EXAMINATION**

15  **BY MR. WEAVER:**

16  Q.   It's Agent Geary?

17  A.   Yes, sir.

18  Q.   Okay.  Agent Geary, did you ever buy any GHB from

19  Mr. Cys?

20  A.   Myself personally as an undercover or as part of

21  the investigation as a whole?

22  Q.   Part of the investigation?

23  A.   Purchase, no, but a free sample of GHB was provided

24  to us.

25  Q.   How large a free sample was that?

```
1   A.   I think it was about a thousand grams possibly.
2   I'd have to look at the documents, but somewhere around
3   that range.
4   Q.   All right.  Did you ask him whether or not he could
5   sell you GHB?
6   A.   No, most of my dealings with him were either
7   purchasing methamphetamine or purchasing the precursor
8   for GHB.
9   Q.   Okay.  Prior to you asking about the
10  methamphetamine, had you had any information that he
11  was actually selling methamphetamine?
12  A.   No.
13  Q.   So you inquired as to whether or not he could get
14  methamphetamine for you?
15  A.   Yes, that's correct.
16  Q.   And did he ever tell you that he didn't really get
17  involved with methamphetamine?
18  A.   He did tell me that.  However, it's contrary to
19  what other people did tell me.
20  Q.   And there were -- and other people -- when you made
21  these deals, other people brought the methamphetamine
22  to the scene; is that correct?
23  A.   That's correct.
24  Q.   And that's not particularly unusual; right?
25  A.   That's not unusual at all.
```

1  Q.   But in the same token, those people that brought

2  the methamphetamine, you later came to find out, were

3  large methamphetamine dealers; is that correct?

4  A.   Yes, that's correct.

5  Q.   And may well have been just his source to be able

6  to get the methamphetamine you requested?

7  A.   That's correct.

8  Q.   Let me ask you, during the course of your

9  investigation, did you find any information in his

10  home, computers, wherever, that he was involved with a

11  product that is called Kid Saver?

12  A.   I didn't find any documents about that.  However,

13  he personally told me about that.

14  Q.   Okay.  There was nothing in the home that indicated

15  that that was part of his business?

16  A.   Not that I've found yet.  We did see his computers.

17  They aren't fully processed yet.  So there's a chance

18  it's in there, but not that I've seen yet.

19  Q.   Did you ever see Mr. Cys use meth?

20  A.   Personally, no.  A confidential source observed him

21  using meth, though.

22  Q.   When you searched his home, that was during the

23  daytime; is that correct?

24  A.   Yes, it was.

25  Q.   Numerous police officers there?

1    A.   Yes.

2    Q.   Is that correct?

3    A.   Yes.

4    Q.   Or law enforcement officers, various kinds.  Did

5    you notice any neighbors or anybody come out watching

6    y'all do your business?

7    A.   Not that I took note of.

8    Q.   Okay.  Would it be fair to say that as far as that

9    location is concerned, it would be tough for him to do

10   any drug business there after the search and whatever

11   went on that day at his home?

12   A.   I'm not sure if I understand the question.

13   Q.   Well, the neighborhood would be alerted to whatever

14   activities that they now learned were going on there;

15   is that correct?

16   A.   That's possible.

17   Q.   Okay.  Mr. Cys debriefed with you at the Collin

18   County Jail, did he not?

19   A.   Yes, he did.

20   Q.   During that debrief, was there actually a shade to

21   the door left open that goes down the hallway; do you

22   recall?

23   A.   I don't recall that.

24   Q.   Okay.  Do you know if other inmates could see him

25   during that debrief?

1   A.   I don't know if anybody saw him or didn't see him.

2   Q.   You mentioned there were several people living at

3   the house with Mr. Cys.  Some of those people were

4   actually indicted in this case; is that correct?

5   A.   Yes, that's correct.

6   Q.   Not all of them?

7   A.   Not all of them.

8   Q.   But did you learn whether or not all of them

9   actually were users?

10  A.   I did not learn about all of them, no.

11  Q.   When you went to Mr. Cys' house on the day of the

12  search, did you find any GHB there?

13  A.   Yes, I believe we did.

14  Q.   And how much GHB do you think you found there?

15  A.   Not a large quantity.  I don't recall 100 percent,

16  though.

17  Q.   Certainly not a quantity that would associate

18  itself with the number of barrels of GBL that were

19  there?

20  A.   Correct.

21  Q.   Could you briefly describe for the Court just how

22  his company was laundering money?

23  A.   I don't think I could.

24  Q.   Okay, how was he laundering money, then?

25  A.   As far as we know, he was taking in large amounts

1  of cash from selling GBL, thousands and thousands of

2  dollars based on the price of GBL in the gallons that

3  he was bringing in.  And he did not have a legitimate

4  company that -- or legitimate means of income to

5  support his vehicles that he was paying for, to support

6  his rent, to support his every-day living expenses.

7  Q.   Okay.  So would you say he was using the profits or

8  the money earned from selling GBL to buy other things

9  or pay rent, utilities, that kind of thing?

10 A.   Utilities, lots of computers, other things that

11 were seen in the house, yes.

12 Q.   How many computers did you find in the house?

13 A.   Several laptops, several tower type computers.

14 Q.   Have you had a chance to download those yet?

15 A.   They're at the North Texas Computer Forensics

16 Laboratory right now being processed and I'm not sure

17 of the state of them at the moment.

18 Q.   Okay.

19          MR. WEAVER:  I'll pass the witness.

20          THE COURT:  All right, redirect?

21          MR. GONZALEZ:  Just a few follow-ups.

22                  **REDIRECT EXAMINATION**

23 **BY MR. GONZALEZ:**

24 Q.   Now, defense counsel asked you if you directly

25 bought GBL or GHB from the defendant and you indicated

1  that you hadn't directly bought.  You bought

2  methamphetamine from the defendant directly; correct?

3  A.   I indicated that I had purchased GBL from him, but

4  I had not directly purchased GHB in an undercover

5  capacity.  But as part of the investigation, he did

6  provide GHB.

7  Q.   And it was understood that the GBL that he was

8  selling you was for the purpose of converting it to GHB?

9  A.   Yes, during the undercover meeting I had with him,

10 when I purchased the GBL, Mr. Cys explains the process

11 for making GHB, and that's what it was used for.

12 Q.   And he indicated that all the GBL that he was

13 selling was for that specific purpose, for the

14 conversion to GHB?

15 A.   That's correct.

16 Q.   Now, you also indicated that you've interviewed

17 other individuals that were either living at the house

18 or were co-conspirators with the defendant; correct?

19 A.   Yes, correct.

20 Q.   And they all talked about the defendant basically

21 having this operation where he's converting GBL to GHB;

22 correct?

23 A.   Yes, that's correct.

24 Q.   And they were interviewed separately from one

25 another; correct?

1    A.   Correct.

2    Q.   So their information corroborated one another?

3    A.   Yes, that's correct.

4    Q.   And it also corroborated what the confidential

5    source had told you about the defendant's involvement

6    in converting GBL to GHB and distributing that;

7    correct?

8    A.   That's correct.

9    Q.   And in regards to the confidential source or

10   sources that were used in this investigation, had they

11   been used before and proven to be credible and

12   reliable?

13   A.   Yes, they had.

14   Q.   Okay.  So you relied on their information; correct?

15   A.   Yes, that's correct.

16   Q.   And they made purchases directly from the

17   defendant; correct?

18   A.   Yes, they did.

19   Q.   And there were no issues with the confidential

20   sources when they worked in that capacity; correct?

21   A.   No issues at all.

22   Q.   And it was a confidential source that indicated to

23   you that he went into the house and saw the defendant

24   using methamphetamine; correct?

25   A.   Yes, that's correct.

1  Q.   And in regards to the laundering of money, he was

2  using this front company to buy the GBL that he would

3  then convert to GHB; correct?

4  A.   Yes, that's correct.

5  Q.   So he would use this company's bank account to

6  purchase from these companies that were supplying GBL?

7  A.   Yes.

8  Q.   Which would then be converted; correct?

9  A.   Correct.

10 Q.   In regards to the neighbors, had the neighbors

11 complained about any activity prior?

12 A.   Not to the DEA.  If they had complained to the

13 Dallas Police Department, we don't know.

14 Q.   So it's fair to say based on what you know, that

15 he was able to conceal his activities there fairly well

16 even from the neighbors?

17 A.   Yes.

18 Q.   Now, you talked about there being computers that

19 are being examined and looked into.  Based on the

20 information either from confidential sources or from

21 other individuals that you've talked to, have you been

22 noticed or told about any acts of violence?

23 A.   Yes.  As part of this investigation, cooperating

24 defendants and a victim of a sexual assault were

25 interviewed.  As part of the interview with the victim

1  of sexual assault, I learned that Mr. Cys had provided

2  a young man with GHB.  That young man had passed out

3  and he had been sexually assaulted.  Through a

4  cooperating defendant, I learned that this had happened

5  to multiple other people by Mr. Cys.

6          I also was told through a cooperating

7  defendant -- and this hasn't been corroborated yet

8  because we don't have the information back with the

9  computers, but the cooperating defendant told us that

10  we'd find child pornography on the computers as well

11  and that Mr. Cys had shown the cooperating defendant

12  that child pornography on multiple occasions.

13  Q.  And had he shown any pictures of individuals that

14  were passed out possibly being the victims that you've

15  just mentioned?

16  A.  Yes, and I've seen pictures of that, as well, of

17  people passed out and unconscious from taking GHB in

18  Mr. Cys' residence.

19  Q.  Okay, thank you.

20          MR. GONZALEZ:  That's all I have.

21          THE COURT:  Any follow-up?

22                  **RECROSS-EXAMINATION**

23  BY MR. WEAVER:

24  Q.  The people that you say you saw pictures of passed

25  out, had they been sexually abused?  Could you tell in

1  the pictures?

2  A.   I can't tell by that, no.

3  Q.   Okay.  Do you know whether the people that you saw

4  passed out were the victims of the sexual abuse?

5  A.   No, I don't know that.

6  Q.   Were the people that you saw passed out adults over

7  the age of 18?

8  A.   As far as I could tell, yes.

9  Q.   What would you say the age of most of those people

10 were?

11 A.   Maybe early twenties.

12 Q.   So they would have been aware of what they were

13 doing?

14 A.   Not necessarily.  GHB is called a date rape drug

15 and it's commonly dropped into people's drinks, so no.

16 If it was passed out in that sense, then no, they

17 absolutely wouldn't have known what they were doing.

18 Q.   Have you contacted any of those individuals that

19 were in the pictures?

20 A.   I haven't identified them.

21 Q.   All right.  Are you going to?

22 A.   If I can identify them, yes.

23 Q.   Do you think, were they known to the people that

24 you had as confidential informants?

25 A.   Not known to the cooperating defendant.

1   Q.   Okay.  What about other individuals that you may

2   have debriefed in this case?

3   A.   Not that I know so far.

4   Q.   All right, thank you.

5        THE COURT:  Anything else, Mr. Gonzalez?

6        MR. GONZALEZ:  No, Your Honor, thank you.

7        THE COURT:  All right.  Thank you.  You may

8   step down.

9        THE WITNESS:  Thank you, Your Honor.

10       MR. GONZALEZ:  Your Honor, we have no further

11  witnesses.  Sorry, not further witnesses.

12       THE COURT:  All right.  Mr. Weaver, you may

13  call your witness.

14       MR. WEAVER:  Your Honor, I would like to make

15  a brief proffer --

16       THE COURT:  Okay.

17       MR. WEAVER:  -- of evidence that we would

18  present.

19       THE COURT:  Okay.

20       MR. WEAVER:  -- on behalf of Mr. Cys.

21            Mr. Cys has basically been a life-long

22  resident of Texas in the Dallas area for 35 years.

23  During that time period he has participated in the

24  creation of what was called the Dallas Plan.  He's done

25  fundraisers for the Dallas Arts Department.  He's

1   volunteered to assist fathers in CPS cases and divorce

2   cases in helping them through those issues.

3          Of his family, only his brother and cousin

4   are living.  He has April Davis, and I will call her in

5   a minute with regard to his custodian.

6          In all of the cases that the Court has

7   awareness of, he's always appeared, shown up when he is

8   supposed to have shown up and appear, I believe, on

9   those cases.

10         THE COURT:  Well, counsel, I don't think

11  that's correct.

12         MR. WEAVER:  Okay.

13         THE COURT:  I think there's two --

14         MR. WEAVER:  Failures.

15         THE COURT:  -- two different instances where

16  his probation was revoked.

17         MR. WEAVER:  Well, but I believe at those

18  hearings he showed up at the revocation hearings, Your

19  Honor.  Even though his probation may have been

20  revoked, a motion was filed, he showed up for those

21  hearings.

22         THE COURT:  Well, probably because he was

23  arrested; right?  I mean, if your probation is revoked,

24  a warrant is issued for your arrest.  I mean, this one

25  in 2004, the report states that he was revoked.  Number

1   one, he was arrested for committing a new violation,

2   failing to report for January through May and failing

3   to report a change of address.  So that certainly

4   doesn't weigh in your favor.

5          MR. WEAVER:  Yes, ma'am.

6          THE COURT:  And then there was another one in

7   2013 where his probation was revoked.

8          MR. WEAVER:  Okay.  I don't deny the criminal

9   history, Your Honor, and what transpired in the

10  revocations.  I'm just saying he has appeared in court

11  when he is supposed to appear.

12         THE COURT:  Okay.

13         MR. WEAVER:  Mr. Cys would submit that his

14  criminal history is directly linked to addictions, drug

15  usage; and we'd ask the Court -- submit to the Court

16  that if he was released on pretrial release, that he

17  would volunteer and would reside in an Oxford House

18  setting, he would attend 90 meetings in 90 days.  He

19  would ask the Court to allow him to be supervised by a

20  leg monitor so that the Court would know where he is at

21  all times.

22             He would submit to the Court that he's had

23  actual jobs and had jobs during this time period, but

24  he has been an Information Systems Coordinator with the

25  Tarrant County Court System.  He's worked as a defense

1  contractor with Baker Hughes, providing logistics in

2  supply chain management.  He has led an emergency

3  response team at a chemical plant in Orange, Texas

4  following a hurricane.  He's recently worked for

5  Accenture in an infrastructure product for Caterpillar.

6  And he's a volunteer for the North Texas Support Teams

7  for the CVS Pharmacies and State Farm.

8           He would like to get out, Your Honor, I

9  think, also so that -- he would like to be able to do a

10  couple of things.  One, he'd like to be able to hire an

11  attorney to represent him.  He's expressed that several

12  times to me.

13           He also --

14           THE COURT:  I'm sorry, why does he need to be

15  out of jail to be able to do that?

16           MR. WEAVER:  To be able to get the funds to be

17  able to hire a lawyer.

18           THE COURT:  You mean to be able to work?

19           MR. WEAVER:  Yes, ma'am.

20           THE COURT:  Okay.

21           MR. WEAVER:  Additionally, for quite a period

22  of time he has been working to develop a product called

23  Kids Saver, which is actually a product that automobile

24  manufacturers put in their vehicles to detect life

25  forms, be it a child, be it a dog, or older person that

1   one might leave in the car.  And he's developed a

2   prototype with that and has actually had meetings with

3   car manufacturers in Detroit.  But he would like to be

4   able, knowing that he's not going to have the time, to

5   finish developing that product, and he thinks it has

6   high value in society in the community.  He would like

7   to be able to be out so that he could get that product

8   in the capable hands that would continue and further

9   develop the product.  He has a prototype already

10  developed for the product and he would like to be able

11  to do that.

12            While I would submit that his criminal

13  history does cover quite a period of time, the nature

14  of the crimes are those generally associated with drug

15  type offenses.  And as far as the identity fraud cases

16  and things like that, they're associated with people

17  with drug problems.  We'd submit it to the Court and we

18  would offer to the Court that we're certainly willing

19  to  treat that and assist the Court in any way and

20  follow any rules the Court will make.

21            THE COURT:  Let me ask you this, Mr. Weaver,

22  because you have focused a lot of your what you said on

23  drug use.  I mean, the report states that the only drug

24  use that your client reported was marijuana tried once

25  37 years ago, and methamphetamines last used two years

1  ago.  So, I mean, either that information is not

2  accurate or there's not a need for inpatient drug

3  treatment at this time.  So which is it?  Is the

4  information not accurate that's in the report that was

5  given to the officer by your client?

6         MR. WEAVER:  I can't answer that question,

7  Your Honor.  I don't know.

8         THE COURT:  Well, I mean, I don't even think

9  an inpatient facility would accept someone if the truth

10 was that that person hadn't used meth in two years.

11        MR. WEAVER:  Well, I'm just saying that a

12 majority of the criminal history that you have is based

13 on prior addiction and drug use.  Obviously, there is

14 some contradiction already in the record with regard to

15 his use of methamphetamine based on Agent Geary's

16 testimony that the confidential informant presented or

17 told him that Mr. Cys was using meth.  So certainly

18 there's a conflict there.

19        THE COURT:  Okay.  All right, thank you.

20        MR. WEAVER:  Thanks.

21        THE COURT:  Mr. Weaver, do you want to call

22 your witness?

23        MR. WEAVER:  Yes.

24        THE COURT:  Okay.

25        MR. GONZALEZ:  Your Honor, in regards to the

```
 1   proffer just given, we would object.  It denies the
 2   Government the opportunity to cross-examine any of
 3   those witnesses.  It's uncorroborated, much like the
 4   information that's in here, where the probation officer
 5   says that he attempted to verify the following
 6   information, but was unsuccessful.  So the information
 7   provided by defense counsel is uncorroborated and it
 8   denies the Government the opportunity to cross-examine
 9   any witnesses.
10           THE COURT:  All right, well, I'll overrule the
11   objection and allow the proffered information to be in
12   the record.  But clearly, the Court recognizes that
13   that information has not been actually provided by any
14   witness here today and the Government has not had an
15   opportunity to cross-examine any of that information.
16              All right, Mr. Weaver.
17           MR. WEAVER:  April Davis.
18           THE COURT:  All right, ma'am, if you will come
19   up to the witness box, please.
20           DEPUTY CLERK:  Do you solemnly swear that the
21   testimony you are about to give in the cause before the
22   Court will be the truth, the whole truth, and nothing
23   but the truth, so help you God?
24           THE WITNESS:  So help me God.
25           DEPUTY CLERK:  Be seated, please.
```

 1              **APRIL DAVIS, CALLED BY THE DEFENSE**

 2                    **DIRECT EXAMINATION**

 3   **BY MR. WEAVER:**

 4   Q.   State your name, please, ma'am.

 5   A.   April Davis.

 6   Q.   And where do you reside, Ms. Davis?

 7   A.   XXX, Rowlett.

 8   Q.   And do you know David Christopher Cys?

 9   A.   Yes, I have for almost 10 years.

10   Q.   All right.  And how did you first meet him?

11   A.   I met him through a mutual friend.  He actually

12   fixed my computer.  Had a virus, was locked down.

13   Q.   You're here offering your services as a third-party

14   custodian for Mr. Cys?

15   A.   I am.

16   Q.   Do you have frequent contact with him?

17   A.   He writes me, I think, daily.

18   Q.   In his current situation?

19   A.   Yes.

20   Q.   When you were out and about in the free world, so

21   to speak, did you have contact with him?

22   A.   I had contacts with him, nowhere near, you know,

23   what we are now that he's locked up, but he had -- we

24   were pretty close several years ago and then we started

25   kinda withdrawing a little bit, I guess with his --

1  Q.   Okay.  Do you think you have -- do you have the

2  ability to stay in contact with him, monitor him?

3  A.   Oh, sure.

4  Q.   Do you think you could be of assistance to the

5  Court in seeing that he follows whatever terms and

6  conditions the Court may lay out for him?

7  A.   I think I do.  He has high regard for me and he

8  values my opinion whether -- it means something to him.

9  Q.   If for some reason, Mr. Cys chose not to follow

10  your opinion and then the instructions, would you

11  report that to the Pretrial Office?

12  A.   I absolutely would.

13  Q.   Okay.

14  A.   Absolutely.  If I had the duty, then I would

15  fulfill it.

16  Q.   All right.

17           MR. WEAVER:  I'll pass the witness.

18           THE COURT:  All right.  Cross-examination.

19           MR. GONZALEZ:  Just briefly, Your Honor.

20                    **CROSS-EXAMINATION**

21  **BY MR. GONZALEZ:**

22  Q.   Ms. Davis, you said you were friends with the

23  defendant prior to his incarceration; correct?

24  A.   Yes.

25  Q.   Did you go over to his house?

1  A.   Every once in a while.  Mainly, we met out for

2  lunch or dinners.

3  Q.   So how frequently do you say that you went over to

4  his house in the past year?

5  A.   In the past year, I bet I went over five or six

6  times.  Maybe a little bit more -- no, not actually,

7  not if you're saying -- like what date are you talking

8  about?

9  Q.   A year prior to his arrest.

10  A.   A year prior to his arrest.  Actually, no, I have

11  not.  When he lived on XXX, I did not like the house or

12  the people he had in it.  And at this new house, when

13  it was the regulars, the original roommates, then I

14  came over.  I came for Thanksgiving.  I cooked for all

15  of them.  At New Year's I showed up.  But as far as

16  hanging out there frequently, no.

17  Q.   Are you familiar with some of the individuals that

18  were living at his house?

19  A.   A few of them.  I think the Ramirez, I think that's

20  the kid.  Yes, I met him about a year ago.

21  Q.   When he was living at the house?

22  A.   No, he never lived at the house.

23  Q.   Did you know he was distributing meth or GHB for

24  him?

25  A.   No, I did not.  I mean, I knew he was a little

1  juicy, but his girlfriend was very nice.

2  Q.   Okay.

3  A.   But as far as him, I only probably encountered him

4  probably four, maybe five times.

5  Q.   What about other individuals that were living

6  there, such as Nicole Rene Martinez?

7  A.   Okay.  As far as drug use?

8  Q.   Yes.  What do you know about drug use?

9  A.   What did I know about the drug use?  Well, I didn't

10 know a whole lot, especially about the GHB.  I'm not

11 really familiar with that.  I know it's popular in the

12 gay community.  I've learned more about it since he got

13 arrested than I ever knew about it.

14 Q.   Did you see any drug use or any individuals using

15 drugs over there when you were there?

16 A.   I think I saw people going off to the bedrooms.

17 Q.   And that was at his residence?

18 A.   Yes, on Clearwater.

19 Q.   Okay.  So some of the individuals were using drugs

20 at his residence; correct?

21 A.   I can't confirm or deny that.  Like I said, some

22 people slipped off into bedrooms.  But as far as out in

23 the open in the living room, in common rooms, no, I did

24 not witness it.

25 Q.   So why did you suspect that that's what they were

1  doing?

2  A.   Well, because, I mean, in a household of gay men,

3  I mean, some of them were a little more animated than

4  others.  Like RuPaul's Drag Race, I don't know if

5  you've ever seen it, but there were a couple of them

6  that were just -- even the gay men would call them

7  flaming, you know.

8  Q.   So it's safe to say that you wouldn't go over to

9  his house all that frequently; correct?

10 A.   No, no.

11 Q.   And that your contact with him was sporadic?

12 A.   By telephone, though, he checked in quite often,

13 you know.  Probably a week didn't go by that I would

14 hear from David on the phone.

15 Q.   So it's safe to say that you weren't aware of his

16 distribution of GHB --

17 A.   No, I was not.

18 Q.   So, if he admitted to doing those things, you were

19 unaware of it and he was able to conceal that from you;

20 correct?

21 A.   He was, but his stress levels are real high.  When

22 I would ask him about it and stuff, he would say that,

23 you know, I'm just going through a lot right now, I've

24 got a lot going on.  And I never pressed the issue.  It

25 wasn't really my business.

1  Q.   But he never told you that he was doing those

2  things, was he -- did he?

3  A.   No, he had not.

4  Q.   So you were unaware of that and he was able to

5  conceal that from you; correct?

6  A.   Yes, but I was aware that something was going on.

7  I mean, that's just my -- I don't know if you call it

8  feminine intuition.  I just knew that something was

9  wrong.

10 Q.   So who did you alert?  Who did you call?  Who did

11 you tell something was wrong or wasn't right?  Anyone?

12 A.   I tried to talk to him about it, but --

13 Q.   Anyone else?

14 A.   No.  Well, let me see.  I think I did talk to a

15 friend of his named Eric one time.  He called me and

16 said he was worried about David.

17         And I said, "In what capacity are you worried

18 about?"

19         And he says, "He's not making good decisions."

20         And I said, "Well, he's a grown man, he'll make

21 decisions he wants."  I said, "All you can do is try to

22 direct him away, you can't lead him."

23 Q.   That's exactly right.  He's a grown man, so if he

24 decided to go back into distributing drugs even while

25 living with you, you wouldn't be able to stop him;

1  correct?

2  A.   He wouldn't be living with me, not in the capacity

3  I could control.

4  Q.   But that's not the question I asked you.  You

5  wouldn't be able to stop him, would you, if he chose to

6  continue to distribute drugs, as he was before?

7  A.   I believe my answer is the same.  I would put him

8  out of my house.  That is the only control I could have

9  is put --

10  Q.   But he was able to conceal that from you before and

11  you didn't know about it?

12  A.   I didn't see him on a daily basis.  And when I did,

13  him and a helper were doing jobs.

14  Q.   So you suspected that there were other things going

15  on, you suspected that there was drug use at his house,

16  and you did nothing about that, either, did you?

17  A.   Well, what should I have done?

18  Q.   Could have called the police.

19  A.   Okay.  On the assumption or possibility?  No, I

20  wouldn't -- anyway, I don't think it's the reality of

21  life.  I mean, we don't pose ourself in other people's

22  business unless it's posing a risk to the community or

23  with people's lives.

24  Q.   But you would agree with me that the distribution

25  of large quantities of GHB and the distribution of

1  large quantities of methamphetamine is a risk to the

2  community?

3  A.   Well, that's the allegations I'm hearing.

4  Q.   And that's what he admitted to.

5  A.   I never heard him admit to methamphetamine.  I

6  mean, I heard him with the GHB, that he ordered the

7  chemical.

8  Q.   But you heard the officer testify that he purchased

9  methamphetamine from him directly.

10  A.   I believe he was connected.  I don't believe that

11  he was supplying -- a supply and demand situation is

12  what I took the testimony to be.

13  Q.   All right, thank you.

14          THE COURT:  Any redirect?

15          MR. WEAVER:  No, ma'am.

16          THE COURT:  All right, thank you, ma'am.  You

17  may step down.

18          THE WITNESS:  Sure.

19          THE COURT:  Mr. Weaver, do you have any

20  other -- yes?

21          DEPUTY CLERK:  May I get the witness' name,

22  please?

23          THE COURT:  April Davis.

24          DEPUTY CLERK:  Thank you.

25          MR. WEAVER:  I have no other witnesses, Your

1  Honor.

2        THE COURT:  All right.  Any additional

3  closing remarks that you want to make at this time,

4  Mr. Gonzalez?

5        MR. GONZALEZ:  No, Your Honor.

6        THE COURT:  All right.  Mr. Weaver, any

7  additional remarks you'd like to make?

8        MR. WEAVER:  If I may have just a moment, Your

9  Honor?

10       THE COURT:  Okay.

11       MR. WEAVER:  My client has something to tell

12 me.

13       *[Pause]*

14       Your Honor, I think Mr. Cys is well aware

15 of the position that he's in.  He believes that should

16 he be released, he would get legitimate employment to

17 be able to hire a lawyer that would assist him getting

18 through the issues that he's facing and the time that

19 he's facing in these cases.  It is his strong desire to

20 be able to get out and get his product, that Kid Saver,

21 in the hands of somebody, give it to somebody so that

22 they can proceed and do it.  He's willing to live under

23 the terms and conditions that the Court would place on

24 him and we believe that by putting him on a monitoring

25 system, having him to report on a regular basis, having

1  his third party custodian, would help the Court and
2  keep him in line to appear.  He understands if he
3  doesn't appear, there's dire consequences to him, that
4  he won't ever be able to overcome with regard to the
5  results of these cases that he has pending against him.
6                    Thank you.
7            THE COURT:  All right, thank you.
8              Mr. Cys, if you will please come to the
9  podium with your attorney.
10             All right.  As has been stated by
11  Mr. Gonzalez, this is a presumption case.  I believe
12  it's actually set for a Pretrial Conference coming up
13  in January 2020.  Based on what's been presented here
14  today, I don't believe the presumption has been
15  rebutted.  And therefore, the Court finds there's no
16  condition or combination that would reasonably assure
17  the appearance or the safety of the community.
18             All right, anything further from counsel?
19         MR. GONZALEZ:  Nothing from the Government,
20  Your Honor.  Thank you.
21         MR. WEAVER:  No, Your Honor.
22         THE COURT:  All right.  We'll stand adjourned.
23  The court will be in recess.
24       *[11:43 a.m. - Proceedings adjourned]*
25

C E R T I F I C A T I O N

    I certify that the foregoing is a correct
transcript of the electronic sound recording of the
proceedings in the above-entitled matter.


/s/ Gwen Reed
2-22-20

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1610